IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONE MILLS CORPORATION, *et al.*, | ) | Case No. 03-12944 (MFW) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| CROMPTON COLORS, INC. | ) | |
| | ) | |
| Appellant | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-232 (GMS) |
| | ) | |
| INTERNATIONAL TEXTILE GROUP, | ) | |
| INC. f/k/a WLR Cone Mills Acquisition | ) | |
| LLC, f/k/a WLR Recovery Fund II, L.P. | ) | |
| | ) | |
| Appellee | ) | |

---

**APPELLEE INTERNATIONAL TEXTILE GROUP, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO CROMPTON CORPORATION'S AND CROMPTON COLORS
INCORPORATED'S APPEAL FROM THE BANKRUPTCY COURT'S
ENFORCEMENT OF ITS SALE ORDER**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

    A.  The Chemtura Site ................................................................................................ 4

    B.  The Debtors' Chapter 11 Cases And The Sale Of Assets To ITG ........................ 5

    C.  The New Jersey Action ......................................................................................... 9

    D.  Discovery Reveals That Chemtura Received Formal Notice Of The Sale To ITG ......... 10

ARGUMENT ................................................................................................................... 13

    A.  Chemtura Is Bound By The Bankruptcy Court's Sale Order Because Chemtura
        Received Due And Proper Notice Of The Sale Of The Debtors' Assets To ITG ........... 13

        1.  Bankruptcy Rule 2002(a)(2), Not Bankruptcy Rule 6004(c), Governs Notice
            Of The Sale Of The Debtors' Assets With Respect To General Unsecured
            Creditors Like Chemtura ......................................................................................... 13

        2.  The Sale Notice Received By Chemtura Is Not Defective And Properly
            Comports With Bankruptcy Rule 2002(a)(2). ......................................................... 17

    B.  Chemtura Received Due and Adequate Notice of the Sale of the Debtors' Assets to
        ITG ......................................................................................................................... 23

        1.  Chemtura Cannot Deny That It Received The Sale Notice ................................. 23

        2.  Chemtura's Failure To Pay Proper Attention To The Sale Notice On Account Of
            Chemtura's Flawed Internal Document Management Procedures Is Not The Fault
            Of Either The Debtors Or ITG ............................................................................... 26

CONCLUSION ................................................................................................................ 28

## TABLE OF AUTHORITIES

### CASES

In re American Properties, Inc.,
  30 B.R. 247 (Bankr. D. Kan. 1983) ................................................................................24

Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),
  96 F.3d 687 (3d Cir. 1996) ...........................................................................................22

City of New York v. New York, N.H. & H.R. Co.,
  344 U.S. 293 (1953) ......................................................................................................22

In re Cossio,
  163 B.R. 150 (B.A.P. 9th Cir. 1994), aff'd, 56 F.3d 70 (9th Cir. 1995) .....................24

In re Cutaia,
  206 B.R. 250 (Bankr. S.D. Fla. 1997) .....................................................................22, 23

Faden v. Insurance Co. of North America (In re Faden),
  96 F.3d 792 (5th Cir. 1996) ..........................................................................................22

In re GST Telecom, Inc.,
  2002 U.S. Dist. LEXIS 18745 (D. Del. July 29, 2002) ......................................18, 19, 20

In re Grand Union Co.,
  204 B.R. 864 (Bankr. D. Del. 1997) ....................................................................24, 26, 27

In re J.B. Winchells, Inc.,
  106 B.R. 384 (Bankr. E.D. Pa. 1989) ...........................................................................23

Lawrence Tractor Co. v. Gregory (In re Gregory),
  705 F.2d 1118 (9th Cir. 1983) ......................................................................................27

Main v. National Union Fire Insurance Co. of Pittsburgh PA (In re Main),
  157 B.R. 786 (Bankr. W.D. Pa. 1992) ..........................................................................23

Moody v. Bucknum (In re Bucknum),
  951 F.2d 204 (9th Cir. 1991) ...................................................................................23, 24

Osborn v. Ricketts (In re Ricketts),
  80 B.R. 495 (B.A.P. 9th Cir. 1987) ...............................................................................24

In re Parrish,
  171 B.R. 138 (Bankr. M.D. Fla. 1994) .........................................................................22

ii

In re Pinnacle Brands, Inc.,
    259 B.R. 46 (Bankr. D. Del. 2001) .................................................................................15

In re Premium Sales Corp.,
    182 B.R. 349 (Bankr. S.D. Fla. 1995)..............................................................................25

In re Schicke,
    290 B.R. 792 (B.A.P. 10th Cir. 2003).............................................................................24

In re Schoon,
    153 B.R. 48 (Bankr. N.D. Cal. 1993) ..............................................................................22

In re Ted A. Furs, Inc.,
    172 B.R. 170 (Bankr. E.D.N.Y 1994), appeal dismissed, 100 F.3d 943 (2d Cir.
    1997) ................................................................................................................................25

U.S. and EEOC v. Knox-Schillinger (In re Trans World Airlines, Inc.),
    322 F.3d 283 (3d Cir. 2003)............................................................................................23

Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit
    Corp.),
    75 B.R. 944 (Bankr. N.D. Ohio 1997) ..............................................................................4

## STATUTES

11 U.S.C. § 363 ........................................................................1, 4, 13, 14, 16, 21, 23, 28

11 U.S.C. § 1107 ...........................................................................................................5

11 U.S.C. § 1108...........................................................................................................5

FED. R. BANKR. P. 2002 ........................................................2, 13, 14, 15, 16, 19, 23

FED. R. BANKR. P. 6004 ............................................................2, 13, 14, 15, 16, 23

FED. R. BANKR. P. 6006 ..............................................................................................18

FED. R. BANKR. P. 7004 ..................................................................2, 13, 15, 16, 18, 22

FED. R. BANKR. P. 9006 ..............................................................................................24

FED. R. BANKR. P. 9014 ...............................................................................14, 15, 18, 19

## PRELIMINARY STATEMENT

The very reason why a potential buyer seeks to acquire a debtor's assets through a bankruptcy sale pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") is because it can do so free and clear of *all* liens, claims and encumbrances. This protection is exactly what International Textile Group, Inc. ("ITG")[1] relied upon when it purchased substantially all of the assets of Cone Mills Corporation and certain of its affiliates (the "Debtors") through an auction and sale of their assets. The auction and sale were supervised by the Honorable Mary F. Walrath, Chief Judge of the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and approved through the Bankruptcy Court's entry of a final and binding Sale Order (as defined below) containing appropriate protections against successor liability, typical of those protections found in all bankruptcy sales.

Despite the clear language of the Sale Order, Crompton Corporation and Crompton Colors Incorporated ("Chemtura") nevertheless commenced a successor liability action against ITG with respect to clean-up costs of certain contaminated property located in Newark, New Jersey, notwithstanding the fact that the very claims Chemtura is asserting are *exactly* the types of claims and liabilities for which ITG cannot be held accountable as a result of ITG's "free and clear" acquisition of the Debtors' assets through the bankruptcy process. Chemtura claims it is not bound by the Sale Order because of its misguided belief that it was not properly notified of the sale of the Debtors' assets to ITG, in the face of irrefutable factual evidence and findings by the Bankruptcy Court that Chemtura received actual and appropriate notice of such sale. Notwithstanding such actual notice, Chemtura argues that it is special and

---

[1]  ITG is formerly known as WLR Cone Mills Acquisition LLC. On August 2, 2004, WLR Cone Mills Acquisition LLC was merged into WLR Burlington Acquisition LLC, which was renamed ITG.

entitled under their reading of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to better service of notice than that due other similarly situated general unsecured creditors. The basis for Chemtura's appeal is that it was somehow entitled to notice of the bankruptcy sale as a secured creditor in accordance with the stricter provisions of Bankruptcy Rule 7004, which applies to adversary proceedings, notwithstanding the fact that Chemtura is not a creditor with a lien or interest in the assets sold by the Debtors to ITG as required for special notice under Bankruptcy Rule 6004(c).

Chemtura's reading of the Bankruptcy Rules is simply incorrect. Bankruptcy Rule 6004(c) is inapplicable to Chemtura because Chemtura has no lien or interest in the assets sold by the Debtors to ITG. In other words, Chemtura is nothing more than another general unsecured creditor of the Debtors. As such, the applicable Bankruptcy Rule with respect to notifying Chemtura—or any other general unsecured creditor—of the bankruptcy sale is Bankruptcy Rule 2002(a)(2), which requires the Debtors to send notice of the sale of their assets to ITG to an address of Chemtura that could be found in the Debtors' records. The Debtors complied with their obligations under Bankruptcy Rule 2002(a)(2), as the Debtors sent a notice of the bankruptcy sale to Chemtura, and such notice was actually received by Chemtura and retained by Chemtura in its files. Consequently, because Chemtura was properly served with notice of the bankruptcy sale, Chemtura's efforts to evade the strictures of the Bankruptcy Court's Sale Order by asserting claims against ITG must fail.

Furthermore, Chemtura has been the sole and exclusive owner of the contaminated property for over twenty years. When New Jersey's environmental authorities discovered contamination in this property, Chemtura pursued anyone and everyone Chemtura

2

thought could possibly share in Chemtura's clean-up costs. To that end, Cone Mills Corporation, as the former owner/operator of the property, consented to an allowed claim by Chemtura against the Debtors' estates for $3.0 million, thus satisfying Cone Mills Corporation's obligations with respect to the property. Chemtura then turned to ITG, hoping somehow to pressure ITG as a "successor" to the same claims into contributing funds toward the clean-up of the contaminated property by asserting claims against ITG, notwithstanding the fact that Chemtura had already been compensated by the "predecessor" in the form of the bankruptcy claim. This was property that ITG could not have bought in the bankruptcy sale even if it wanted to, and such property related to a line of business that Cone Mills Corporation ceased twenty years prior, and the liability arising from this property was specifically excluded in the acquisition by the Sale Order.

Moreover, ITG did not receive a windfall by virtue of its acquisition of the Debtors' assets in a bankruptcy sale free and clear of liabilities. Rather, the value of the acquired assets were market tested through the bankruptcy auction process, and—by definition—ITG paid fair value for such acquired assets. Finally, ITG would *never* have acquired the Debtors' assets if ITG believed it could be subject to successor liability. If liable for actions of one of the Debtors from more than twenty years ago, ITG would have untold liabilities that would very quickly destroy all economic benefit of its acquisition of the Debtors' assets. Allowing successor liability here would truly be inequitable.

Chemtura received actual and formal notice of the bankruptcy sale, yet did *nothing* about it, and Chemtura thus acted at its own peril when it ignored the Debtors' notice of the bankruptcy sale. Chemtura cannot now come to this Court and argue that it was never properly notified of the bankruptcy sale when the facts, as they were developed through

3

discovery and accepted by the Bankruptcy Court, demonstrate otherwise. ITG should not be punished because of the negligence and carelessness demonstrated by Chemtura, a sophisticated commercial entity, when, even after receiving notice of the bankruptcy sale, Chemtura simply sat on its rights and did ***nothing***.

This Court should therefore affirm and uphold the Bankruptcy Court's findings that Chemtura received actual and sufficient notice of the bankruptcy sale, and that Chemtura is therefore bound by the Bankruptcy Court's Sale Order, which prohibits Chemtura's successor liability actions against ITG. Any other decision by this Court would not only be contrary to the priority schemes set forth in the Bankruptcy Code, but would also call into question the validity of ***all*** sales pursuant to section 363 of the Bankruptcy Code, which depend on the protections of bankruptcy court orders transferring assets free and clear of all liabilities.[2]

## STATEMENT OF FACTS

### A.  The Chemtura Site

Sometime after 1930 and before 1966, one of the debtor entities, Cone Mills Corporation ("Cone Corp.") purchased certain real property located at 52 Amsterdam Street in Newark, Essex County, New Jersey (the "Chemtura Site"). From 1930 through 1979, Cone Corp. conducted certain dye and chemical manufacturing operations at the Chemtura Site. In the late 1970's, Cone Corp. sold its product line to Ciba Geigy and in 1980, Cone Corp. sold the

---

[2]    ITG submits that if Chemtura were allowed to prosecute its successor liability action against ITG, such a decision "would chill and deleteriously affect sales of corporate assets, forcing debtors to accept less on sales to compensate for this potential liability. This negative effect on sales would only benefit [successor] liability claimants, thereby subverting specific statutory priorities established by the Bankruptcy Code." Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 951 (Bankr. N.D. Ohio 1997).

4

Chemtura Site to a predecessor of Chemtura, at which time Cone Corp. also ceased and forever abandoned its dye and chemical manufacturing operations.

Since purchasing the Chemtura Site from Cone Corp., Chemtura has been the sole and exclusive owner of and has been the only entity to conduct operations at the Chemtura Site. After an investigation conducted by the New Jersey Department of Environmental Protection (the "NJDEP") in 2001, which investigation revealed the existence of certain pollutants in the soils and groundwater underlying the Chemtura Site, Chemtura undertook the cleanup of such pollutants.

ITG does not now nor has it ever conducted any operations whatsoever at or had anything to do with the Chemtura Site.[3]

## B. The Debtors' Chapter 11 Cases And The Sale Of Assets To ITG

On September 24, 2003, the Debtors filed their chapter 11 cases with the Bankruptcy Court. Soon thereafter, the Debtors promptly commenced a sale process to sell substantially all of their assets for the highest and best offer.[4] The Debtors, which were debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, then moved the Bankruptcy Court for permission to sell substantially all of their assets, and provided notice of

---

[3]  Although in-house counsel for both Chemtura and Cone Corp. exchanged several correspondence with respect to the Chemtura Site, which correspondence dated back approximately two years prior to the commencement of the Debtors' chapter 11 cases, Chemtura never asserted a demand for any particular monetary amount against the Debtors. Consequently, the Debtors' records reflected that any claim Chemtura arguably had against the Debtors' estates was a claim in the amount of $0.00. The parties later settled by the Debtors allowing Chemtura a $3.0 million claim in their bankruptcy cases.

[4]  A form of notice of the sale was approved by the Bankruptcy Court for mailing to all known creditors in lieu of service of a copy of the sale motion itself.

the sale process to parties-in-interest and interested buyers.[5]  After an extensive marketing process, ITG was selected as the highest and best bidder for the Debtors' assets.

On February 12, 2004, after notice and a two-day hearing, the Bankruptcy Court entered an *Order Authorizing (A) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Subject to Higher or Better Offers, (B) Approving the Amended and Restated Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With Such Sale, and (D) Granting Related Relief* (the "Sale Order").  (*ITG Ex. 11*).[6]  Pursuant to the Sale Order and the Amended and Restated Asset Purchase Agreement (the "APA") referenced therein, the Debtors and their affiliates sold substantially all of their assets to ITG.  The transaction between the Debtors and certain of their affiliates, on the one hand, and ITG, on the other, closed on March 12, 2004.  The Chemtura Site was never acquired by ITG.  Indeed, it was impossible for ITG to acquire the Chemtura Site because, as stated above, the Chemtura Site was sold by Cone Corp. to Chemtura's predecessor-in-interest some twenty-four years before ITG sought to acquire the Debtors' assets.

---

[5]  As merely a potential acquirer of the Debtors' assets, ITG was under no obligation to provide notice of the Debtors' sale of their assets to parties-in-interest.  ITG therefore notes that Chemtura's mischaracterization of Wilbur Ross, the founder of ITG, as set forth in Chemtura's opening brief is highly inappropriate because, among others, (i) the business practices of Wilbur Ross are not at issue in this dispute and (ii) the assertion that Wilbur Ross has "abused" the bankruptcy laws is incorrect and arguably libelous.  See Appellant's Br. 8, Crompton Colors, Inc. v. International Textile Group Inc., Civil Action No. 05-232 (D. Del. filed April 21, 2005).

[6]  Exhibit numbers referenced herein shall refer to the Item Numbers in both the *Appellants Crompton Colors, Inc. and Crompton Corporation's Amended Statement of Items to be Included in the Record on Appeal Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure* (Docket No. 3) ("*Appellant's Ex. ___*") and the *Appellee's Counter-Designation of Contents of Record on Appeal Pursuant to FED. R. BANKR. P. 8006* (Docket No. 4) ("*ITG Ex. ___*").

6

The Bankruptcy Court's Sale Order contained numerous provisions that protected ITG as a buyer in a bankruptcy sale. More specifically, the Sale Order provided that the sale of the Purchased Assets defined in the APA (called the "Assets" in the Sale Order) would be free and clear of liens, claims and encumbrances, including:

> all debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including but not limited to claims otherwise arising under doctrines of successor liability (collectively, "Interests").

(*ITG Ex. 11* ¶ O.).

Importantly, the Sale Order's findings include appropriate provisions that ITG would not have entered into the APA or consummated the transactions if the sale of the Assets were not free and clear of all Interests or if ITG would, or in the future could, be held liable for any of the Interests, including environmental liabilities. (Id. ¶¶ P and 31.). Indeed, the "free and clear" language of the Sale Order was carefully crafted and specifically approved by the Bankruptcy Court following a two-day hearing on objections by certain creditors to the sale of the Assets free and clear of all Interests; the Sale Order resolved those objections and reflects the clear intent of the parties and the Bankruptcy Court.

The Sale Order further provides that (i) the Debtors are authorized to perform their obligations under and comply with the terms of the APA, (id. ¶ 4), and to take all further

7

actions as may be requested by ITG or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA, (id. ¶ 5); (ii) the Sale Order is binding on all creditors whether known or unknown, (id. ¶ 6); (iii) the Assets are transferred free and clear of all Interests with all such Interests to attach to the net proceeds of the Sale, (id. ¶ 8); (iv) "all persons and entities" and other creditors holding Interests of any kind against the Debtors or the Assets "arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, and the operation of the Debtors' business prior to the Closing, or the transfer of the Assets to [ITG], hereby are forever barred, estopped, and permanently enjoined from asserting against [ITG], its successors or assigns, its property, or the Assets, such persons' or entities' Interests." (id. ¶ 9) (emphasis added); and (v) all Interests "have been unconditionally released, discharged and terminated" with respect to the Assets. (Id. ¶ 25.).

Most significantly, the Sale Order provides that ITG "shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and [ITG] shall have no successor or vicarious liabilities of any kind or character, including but not limited to any theory of antitrust, environmental, successor or transferee liability, *de facto* merger, or substantial continuity . . . with respect to the Debtors or any obligations of the Debtors arising prior to the Closing . . . ." (Id. ¶ 31) (emphasis added). And "[f]ollowing the Closing, no holder of an Interest in the Debtors or the Assets shall interfere with the [ITG's] title to or use and enjoyment of the Assets based on or related to such Interest . . . ." (Id. ¶ 32.).

The Sale Order also states that the Bankruptcy Court retained "jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto . . . [and to] interpret, implement, and enforce the provisions of [the Sale] Order and . . . protect [ITG]

against (i) any of the Excluded Liabilities or (ii) any Interests in the Debtors or the Assets of any kind or nature whatsoever." (Id. ¶ 33) (emphasis added).

Chemtura never filed a notice of appearance in the Debtors' chapter 11 cases. In addition, Chemtura did not file an objection to the sale nor did Chemtura appear at the sale hearing, despite receiving notice thereof.

## C. The New Jersey Action

Despite the multitude of applicable terms and provisions in the Bankruptcy Court's Sale Order, approximately six months after entry of the Sale Order, on August 19, 2004, the NJDEP and the Administrator of the New Jersey Spill Compensation Fund (the "Administrator") filed a complaint in the Superior Court of New Jersey, Law Division, Essex Vicinage (the "Superior Court") No. L-6599-04 against ITG and Chemtura (the "New Jersey Action"). (See Ex. 3 annexed to ITG Ex. 12). The complaint is premised on liabilities arising out of ITG's and Chemtura's alleged violations of New Jersey's Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to –23.24, as well as other allegedly tortious acts.

On October 19, 2004, Chemtura filed an Answer in the New Jersey Action, which Answer also asserted cross-claims against ITG. ITG's cross-claims include, among other things, claims for contribution and unjust enrichment. (See Ex. 4 annexed to ITG Ex. 12). On November 24, 2004, in an effort to resolve the New Jersey Action as it related to ITG, ITG supplied both the NJDEP and Chemtura with a copy of the Sale Order and, subsequently, the Debtors' First Amended Disclosure Statement and other pertinent information to explain that ITG has no involvement whatsoever with the Chemtura Site. On January 6, 2005, ITG's counsel in New Jersey wrote to the NJDEP and Chemtura on January 6, 2005 and requested ITG be

9

dropped from the New Jersey Action in light of the information provided to the NJDEP and Chemtura.

In response, on January 7, 2005, Chemtura filed an Order to Show Cause for Emergent Relief (the "Order to Show Cause") in the New Jersey Action, arguing that the Superior Court should enter an order on an expedited basis holding that the Sale Order is not applicable. The Superior Court has not yet scheduled the return date and the hearing on the Order to Show Cause remains pending the resolution of the issues raised before this Court.

## D. Discovery Reveals That Chemtura Received Formal Notice Of The Sale To ITG

On January 7, 2005, ITG filed the *Motion of International Textile Group, Inc. for Order Directing The New Jersey Department of Environmental Protection, the Administrator of the New Jersey Spill Compensation Fund, Crompton Colors, Inc. and Crompton Corp. to Comply with the Sale Order* (the "Motion to Enforce the Sale Order") with the Bankruptcy Court. (*ITG Ex. 12*). Subsequently, on January 10, 2005, ITG filed a complaint in the Bankruptcy Court against the NJDEP, the Administrator and Chemtura, seeking, among other things, to enforce the Sale Order and to hold the NJDEP, the Administrator and Chemtura in contempt for violating such Sale Order. The parties filed several responsive pleadings and on January 27, 2005, the Bankruptcy Court held a hearing to consider the Motion to Enforce the Sale Order and scheduled an evidentiary hearing to be held on February 24, 2005 to determine, among other things, whether Chemtura was a known creditor for purposes of the Sale Order.[7]

---

[7]    The NJDEP, on the other hand, stipulated that "it received adequate notice of ... the sale of substantially all of the Debtors' assets to WL Ross & Co. LLC ... and agrees that it will not raise or contest the issue of notice at the [Evidentiary Hearing ] " (See *ITG Ex. 13* ¶ 1 n 2).

During the course of discovery, the Debtors produced conclusive evidence that Chemtura (then known as Crompton Corporation) was identified by the Debtors prior to the sale as a party-in-interest to the sale, and that Chemtura was given *actual and direct notice* of the bankruptcy sale. More specifically, discovery revealed that on February 15, 2005, counsel to the Debtors reported to ITG's counsel that, upon further review, the Debtors determined that a copy of the *Supplemental Notice of Possible Assumption, Sale and Assignment of Certain Unexpired Leases and Executory Contracts and Sale Hearing* (the "Sale Notice") dated November 25, 2003, (*ITG Ex. 2*), was served via Federal Express upon Crompton Corporation, Benson Road, Middlebury, Connecticut 06749. Proof of that service was established by the *Affidavit of Service of Lisa Talley* (the "Affidavit of Service") dated July 2, 2004, as filed with the Bankruptcy Court on July 2, 2004, (*ITG Ex. 3*), certifying that Ms. Talley caused a copy of the Sale Notice to be served via Federal Express upon Crompton Corporation, Benson Road, Middlebury, Connecticut 06749. In addition, the Debtors produced an ordinary course business record from the offices of Federal Express, (*ITG Ex. 8*), verifying that a copy of the Sale Notice with tracking number 646295651733 was sent on November 25, 2003, from Debtors' counsel, Young, Conaway, Stargatt & Taylor, LLP, and was delivered to Crompton Corporation, 199 Benson Road, Middlebury, Connecticut, 06749, on November 26, 2003, at approximately 10:23 a.m. The report included a copy of a signature acknowledging receipt of the Sale Notice.

Evidently, upon receipt of the Sale Notice, rather than forwarding it to an appropriate person, Chemtura's Credit Department simply placed the Sale Notice in a "dead" or "inactive" file, where it languished for over one year. In fact, Chemtura's 30(b)(6) designee, Mary O'Neil, testified that she found the Sale Notice in this approximately seven-inch high "dead" or "inactive" file within a matter of minutes. (See *Appellant's Ex. 3 Tr. Dep. Mary*

11

*O'Neil* 55:18-25; 56:15-21 (Feb. 23, 2005)).   This evidence that surfaced during discovery presents unmistakable proof that Chemtura in fact *did receive actual and direct notice of the sale*.   The Sale Notice represents a form of notice previously approved by an order of the Bankruptcy Court and reasonably describes the nature of the property being sold, the date and time of the sale hearing, and the deadline to object to the sale.   The Affidavit of Service and the copy of the return receipt create the presumption that the Sale Notice was indeed sent to, and received by, Chemtura, and that this presumption can only be set aside if Chemtura comes forward with *clear and convincing evidence* that it has not received such notice.   Chemtura was and is still unable to come forward with clear and convincing evidence that it never received the Sale Notice.

Instead, Chemtura simply avers in its opposition to ITG's Motion For Temporary Restraining Order dated January 12, 2005 that "there was *no notice* of any kind", (*ITG Ex. 13* ¶ 4), and that the Debtors "disregarded their obligations to provide direct written notice to Chemtura."   (Id.).   Even worse, in a sworn affidavit submitted to the Superior Court, in connection with the New Jersey Action, counsel to Chemtura goes so far as to certify that he "conducted and supervised an investigation into whether Cone Mills provided any notice of its bankruptcy to Chemtura Colors, Inc., Chemtura Corp. or any affiliated entity," that the investigation "included a review of the notice listings in the bankruptcy matter," and that "[n]o such notice was given or received."   (See *Ex. E annexed to ITG Ex. 13 Certification of Jerry L. Tanenbaum* dated January 7, 2003) (emphasis added).

On February 28, 2005, the Bankruptcy Court held a hearing and found that Chemtura was indeed served with proper formal notice of the sale of substantially all of the

12

assets of the Debtors to ITG.[8]   The Bankruptcy Court also properly held that the Sale Notice

constituted due and proper notice to Chemtura.   Additionally, the Bankruptcy Court found that

because Chemtura had no lien or interest in the assets sold to ITG, Chemtura was no different

from any other general unsecured creditor in the Debtors' chapter 11 cases, and was entitled to

the same form and manner of notice.   Consequently, the Bankruptcy Court held that, because the

Debtors complied with Bankruptcy Rule 2002(a)(2), Chemtura was bound by the provisions of

the Bankruptcy Court's Sale Order.

Chemtura was not left without recourse.   It maintained its claim against the

Debtors, and, pursuant to a settlement between Chemtura and the Debtors, Chemtura has an

allowed general unsecured claim against the Debtors in the amount of $3.0 million.

## ARGUMENT

**A. Chemtura Is Bound By The Bankruptcy Court's Sale Order Because Chemtura Received Due And Proper Notice Of The Sale Of The Debtors' Assets To ITG.**

**1. Bankruptcy Rule 2002(a)(2), Not Bankruptcy Rule 6004(c), Governs Notice Of The Sale Of The Debtors' Assets With Respect To General Unsecured Creditors Like Chemtura.**

Chemtura insists that the Debtors should have provided Chemtura notice of the

Debtors' sale of their assets to ITG under section 363 of the Bankruptcy Code in accordance with

Bankruptcy Rule 7004, applicable to bankruptcy sales involving lien stripping by virtue of

Bankruptcy Rule 6004(c).   A plain language reading of the relevant sections of the Bankruptcy

---

[8]    At the same hearing, the Bankruptcy Court also enforced the Sale Order against the NJDEP and the Administrator and enjoined such parties from pursuing the claims set forth in the New Jersey Action against ITG.  By stipulation among the parties, The NJDEP and the Administrator have dismissed the New Jersey Action with respect to ITG.  Chemtura, however, continues to pursue its cross-claims against ITG in the New Jersey Action in violation of the Sale Order, and the parties to the New Jersey Action have all signed a consent order, which has not yet been entered by the Superior Court, extending the time for discovery through March 14, 2006.

13

Code and the applicable Bankruptcy Rules, however, demonstrates that Chemtura's understanding of proper notice to general unsecured creditors with respect to sales free and clear of all liens, claims and encumbrances is erroneous.

When a trustee or a debtor-in-possession seeks to sell assets free and clear of all liens, claims and encumbrances, then such sale is governed by the provisions of section 363 of the Bankruptcy Code. More specifically, section 363(b)(1) of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

To comply with the provisions of section 363 of the Bankruptcy Code, notice of the sale must be given to parties-in-interest. The type of notice a party receives depends on that party's standing and status in the bankruptcy case. For instance, notice of a bankruptcy sale to party that has a lien or interest in the property to be sold by the debtor is governed by Bankruptcy Rule 6004(c), while notice of such a sale to a general unsecured creditor like Chemtura is governed by Bankruptcy Rule 2002(a)(2).

Bankruptcy Rule 6004 states in pertinent part:

> (a) *Notice of Proposed Use, Sale or Lease of Property.* Notice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and, if applicable, in accordance with § 363(b)(2) of the Code.
>
> (c) *Sale Free and Clear of Liens and Other Interests.* A motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the

14

> time within which objections may be filed and served on the debtor
> in possession or trustee.

FED. R. BANKR. P. 6004.

Bankruptcy Rule 9014, in turn, provides that service should conform to Bankruptcy Rule 7004. Id. 9014. Bankruptcy Rule 7004 provides that service should comply with the rules that govern adversary proceedings. Id. 7004.

Bankruptcy Rule 2002(a)(2) states in relevant part:

> (a) *Twenty-Day Notices to Parties in Interest.* Except as provided
> in subsections (h), (i), and (l) of this rule, the clerk, or some other
> person as the court may direct, shall give the debtor, the trustee, all
> creditors and indenture trustees at least 20 days' notice by mail of:
>
> (2) a proposed use, sale, or lease of property of the estate other
> than in the ordinary course of business, unless the court for cause
> shown shortens the time or directs another method of giving notice
> . . . .

Id. 2002(a).

As a threshold matter, Chemtura has *no* lien or other interest whatsoever in the property sold by the Debtors to ITG. Chemtura does not assert that it has a lien, and further has not filed any security interest or mortgage that would give it the status of a lien holder. Similarly, Chemtura does not have any "other interest in the property" that would entitle it to notice under Bankruptcy Rule 6004(c). Thus, ITG can discern no basis on which Chemtura would be entitled to service of notice under Bankruptcy Rule 6004(c). See, e.g., In re Pinnacle Brands, Inc., 259 B.R. 46, 53 (Bankr. D. Del. 2001) (J. Walrath) (stating that because a claimant had no interest in inventory sold by the debtor, the claimant "was not entitled to notice of the sale of the inventory . . . .").

15

Because Chemtura is merely a general unsecured creditor, the applicable notice rule with respect to the sale of the Debtors' assets as it related to Chemtura is Bankruptcy Rule 2002(a)(2), and not the more detailed notice provisions required in order to strip off a lien or other interest, as required by Bankruptcy Rule 7004, which would be applicable pursuant to Bankruptcy Rule 6004(c) again only if Chemtura had a lien of some sort on the property sold by the Debtors, which it plainly does not.

If this Court were to accept Chemtura's reading of the Bankruptcy Rules, then effectively, *all* general unsecured creditors in *all* reorganization or liquidation cases are entitled to notice with a heightened degree of specificity pursuant to Bankruptcy Rule 7004 for all sales under section 363 of the Bankruptcy Code. In other words, all creditors would be required to receive notice as if they were being sued in an adversary proceeding. This simply cannot be correct, as Chemtura's interpretation of the Bankruptcy Rules would effectively read Bankruptcy Rule 2002(a)(2) out of the Bankruptcy Rules, and would also increase the time, burden and costs to any debtor's estate if Bankruptcy Rule 7004 were indeed the proper rule with respect to noticing parties with pleadings pertaining to the sale of a debtor's assets. Taken to the extreme, Chemtura's reading of the Bankruptcy Rules would open the floodgates for all general unsecured creditors in all cases filed since the promulgation of the Bankruptcy Code to challenge the validity of *any* sale order, and claim that they are not bound by such sale order on account of faulty service pursuant to Bankruptcy Rule 2002(a)(2). This Court cannot allow that outcome to occur.

16

**2. The Sale Notice Received By Chemtura Is Not Defective And Properly Comports With Bankruptcy Rule 2002(a)(2).**

The content of the Sale Notice received by and found in Chemtura's files is not defective and satisfies any and all of Chemtura's supposed Constitutional due process concerns. Chemtura stubbornly argues that, despite its actual receipt of the Sale Notice, the content of the Sale Notice did not properly apprise Chemtura of the sale of the Debtors' assets to ITG. Indeed, Chemtura asserts that the Sale Notice "related <u>primarily</u> to the assumption of executory contracts . . . ." (Appellant's Br. 14) (emphasis added)   Chemtura has either mischaracterized or simply failed to read the Sale Notice because the Sale Notice contains the following information:

- The caption discloses that the filing involves the Debtor, and the title of the document included the words *Sale Hearing*.

- Paragraph 1 of the Sale Notice states in no uncertain terms that on November 10, 2003, the Bankruptcy Court entered an order approving the Debtors' motion for an order approving the sale procedures governing their proposed sale of all or substantially all of their assets.

- Paragraph 2 of the Sale Notice states that the Bankruptcy Court approved the motion governing the sale procedures governing the sale of the Debtors' assets.

- Paragraph 3 of the Sale Notice states that a hearing would be held on February 9, 2004 for the Bankruptcy Court to consider whether to enter an order approving the sale of all or substantially all of the Debtors' assets to ITG.

- Paragraph 4 of the Sale Notice states that "with its proposed asset sale(s), the Debtors intent to . . . sell . . . free and clear of all liens, claims, encumbrances, and interests . . . ."

(<u>See</u> *ITG Ex. 2* ¶¶ 1-4.).

Thus, contrary to Chemtura's assertions, the Sale Notice, which was approved by the Bankruptcy Court, contained detailed information regarding the impending sale of the

17

Debtors' assets to ITG. In fact, such Sale Notice contained as many details as the earlier notices sent out to the creditors listed in the Debtors' creditor matrix. It is highly disingenuous now for Chemtura to assert brazenly that the only notice it received from the Debtors' with respect to their sale of their assets to ITG was "related primarily to the assumption of executory contracts, and the amount of cure that would be provided as part of the asset Sale[]", (Appellant's Br. 14) (emphasis added), especially when the Sale Notice sets forth information about the sale of the Debtors' assets in paragraphs 1-3 of the Sale Notice. In fact, information about assumption of contracts does not appear in the Sale Notice until paragraph 4.[9] Chemtura thus cannot say with a straight face that this Sale Notice was inadequate as it "related primarily" to assumption of contracts because the first 3 paragraphs of the Sale Notice would clearly inform any reader thereof that the Debtors intended to sell substantially all their assets to ITG "free and clear of all liens, claims, encumbrances and interests . . . ." (See *ITG Ex. 2* ¶ 4.).

To support its position, Chemtura relies heavily on In re GST Telecom, Inc., 2002 U.S. Dist. LEXIS 18745 (D. Del. July 29, 2002) ("GST"), a copy of which is attached hereto, to assert that the Debtors and ITG did not comply with the Bankruptcy Rules with respect to serving notice of the sale of the Debtors' assets. Such reliance, however, is misplaced. In GST, the debtors were liable for certain sales taxes to the creditor, the State Board of Equalization of the State of California (the "State"),[10] arising from the debtors' sale of assets to Time Warner Telecom. Id. at **9-10. The bankruptcy court entered an order establishing a tax bar date,

---

[9]   ITG does not dispute that Chemtura does not have any executory contracts with the Debtors. ITG, however, maintains that contrary to Chemtura's misrepresentations, the information in the Sale Notice does not pertain *solely* to cure amounts, and thus, Chemtura's argument that the Sale Notice was still served improperly because notices of cure amounts must comply with Bankruptcy Rule 6006, which implicates Bankruptcy Rules 9014 and 7004, must also fail. (See Appellant's Br. 27-28.)

[10]  The creditor in GST is a governmental entity, *not*, as Chemtura misrepresents, "a creditor corporation[]". (Id. at 28.)

18

which order was sent to the parties in the debtors' service list. Id. at *10. The State alleged that it did not receive a notice of this tax bar date, and, consequently, the State did not timely file its tax claim. Id. The State moved for summary judgment, arguing that the court should excuse its untimely filing of its tax claim because the State failed to receive proper notice of the tax bar date. Id. at *8. The debtors cross-moved for summary judgment, arguing that their service of notice to the State was appropriate under the Bankruptcy Rules. Id.

In disposing of the issues before it, the Court first found that a tax bar date is not a contested matter, and therefore, Bankruptcy Rule 9014 is not applicable with respect to notices regarding the tax bar date. Id. at *20. Instead, the Court held that the applicable notice rule in GST was Bankruptcy Rule 2002. Id. The Court then ruled on whether the notice to the State was proper under Bankruptcy Rule 2002. The debtors argued that they complied with Bankruptcy Rule 2002 but the Court disagreed, finding that the debtors failed to comply with Bankruptcy Rule 2002 because the debtors failed to include important routing information in the notice addressed to the State.[11] Id. at *22. The Court found that the omission of this routing information was significant as such information was necessary to direct the notice to the responsible person or department in an agency as large as the State. Id. Interestingly, the Court noted that "it is possible for actual notice to substitute for proper service" and that in GST, there was "a question of fact regarding whether [the State] received actual notice of the bar date." Id. at *25. Thus, the Court did not grant the State's motion for summary judgment as it found that "questions of fact remain as to whether [the State] had actual notice of the bar date." Id. at *27.

---

[11]  The State's designated address was "State of California, Board of Equalization, MIC 29, P.O. Box 942879, Sacramento, CA 94279-0001." The debtors sent their notice of the tax bar date to this address, except the debtors failed to include the line "MIC 29" in their notice. In re GST Telecom, Inc., 2002 U.S. Dist. LEXIS 18745, at *22 (D. Del. July 29, 2002).

19

The facts in this case are very different from those presented in GST. In GST, the Court held that service upon an agency of the State of California was improper where the notice was delivered to the *wrong address*. Under those circumstances, where there was no actual notice and where the notice may have been lost in the vast labyrinth of the bureaucracy of one of the most populous states of the Union, the Court held that service was improper.

By contrast, in this case, the Sale Notice was sent to the correct address, and Chemtura conceded receipt of the Sale Notice. The Sale Notice was delivered to Chemtura's headquarters at 199 Benson Road, Middlebury, Connecticut. (See *Appellant's Ex. 6 Tr. Dep. Pamela Missal* 10:8-15; 11:13-14 (Feb. 22, 2005)). Those headquarters were housed in a three story building and staffed by five hundred and fifty employees. (Id. 7:6-13.). The Sale Notice was received by the mailroom at the so-called terrace level, and then delivered to the Credit Department, which was located on the same level. (*Appellant's Ex. 3 Tr. Dep. Mary O'Neil* 9:25-10:4; 29:5-17 (Feb. 23, 2005)). Even though: (1) Chemtura's Credit Department (which was comprised of eleven people, (id. 8:25-9:24), was a three minute walk, (id.), from its Legal Department, which was comprised of eleven lawyers, in contiguous offices, (*Appellant's Ex. 6* 12:12-15; 63:21-66:25), and which was located on the next floor, the first floor; (2) the Credit Department and the Legal Department were linked by an internal e-mail system, (*Appellant's Ex. 3* 43:3-7); and (3) there was a person designated as the liaison between the Credit Department and the Legal Department, (id. 11:24-12:16), the Credit Department never bothered to forward the Sale Notice to the Legal Department. Instead, the Sale Notice was placed in an "inactive file". (Id. 26:5-27:2); (see also *Appellant's Ex 6* 52:8-24.). This file, which was seven inches high and contained bankruptcy notices from a multitude of cases, had been accumulated by the Credit Department over the prior eighteen months. (*Appellant's Ex 3* 54:4-55:19.). Chemtura's

Credit Department located the Sale Notice *within less than ten minutes* of being asked to search for it. (Id. 55:4-56:20.). The Sale Notice was placed in the "inactive" file after Chemtura determined that there was no outstanding receivable owing from Cone Mills Corporation to Chemtura at the time of the Sale Notice. (*Appellant's Ex. 6* 53:9-25.).

Under Chemtura's policies, if the Credit Department had bothered to forward the Sale Notice to the Legal Department, the Legal Department would have checked its files to identify the matter. (Id. 54:10-55:3.). The Legal Department had an existing file for the Chemtura Site that contained the correspondence between Cone Mills Corporation and Chemtura relating to such site. (Id. 56:16-58:11); (see also *Appellant's Ex. 3* 61:10-62:2.). For unexplained reasons, Chemtura did not grant its Credit Department access to the Legal Department's database. (*Appellant's Ex. 3* 52:7-21.). Such access would have enabled the Credit Department to track legal notices. In sum, in stark contrast to the creditor in GST, i.e., the State of California, Chemtura is a mid-sized corporation with a leanly-staffed corporate headquarters, whose inadequate internal policies are to blame for any confusion relating to the Sale Notice.

In addition, unlike in GST, where a tax bar date was at issue, here, the Debtors sold their assets free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code. The Debtors here did not seek to cut off a tax bar date of a governmental entity, which Chemtura certainly is not. More importantly, in GST, there remained a question of fact as to whether the State ever received a notice from the debtors. In this case, however, as discussed in more detail in Section B infra, Chemtura *actually received* the Sale Notice from the Debtors. The Debtors used the address that appeared in Chemtura's letterhead when sending the

21

Sale Notice, and such Sale Notice ended up in the hands of Chemtura. Moreover, Chemtura did not lose its claim against the Debtors. It only had its right to proceed on successor liability claims against ITG cut off by the Sale Order. If the right to pursue successor liability were required by the Bankruptcy Court, ITG would *never* have closed on the sale because the numbers and amounts of possible successor claims against ITG would render the transaction uneconomical for ITG.

Other cases cited by Chemtura do not further aid Chemtura's argument that it did not receive notice from the Debtors because in such cases, the creditors either had liens or interests in the property sold by the debtors and were entitled to better notice, or the debtors in those cases did not provide proper notices to their creditors. See, e.g., City of New York v. New York, N.H. & H.R. Co., 344 U.S. 293 (1953) (publication notice was insufficient to bar the enforcement of New York City's liens imposed on debtor railroad's real property); Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 96 F.3d 687 (3d Cir. 1996) (plaintiffs were allowed to proceed with their post-petition defamation claims against the debtors because plaintiffs were not given actual notice of the debtors' confirmation hearing); Faden v. Ins. Co. of North Am. (In re Faden), 96 F.3d 792 (5th Cir. 1996) (claims of creditor, which were secured by a state judgment against chapter 7 debtors, were held non-dischargeable pursuant to section 523(a)(3)(A) of the Bankruptcy Code because the debtors made no attempt to provide notice of the bankruptcy petition to their creditor); In re Schoon, 153 B.R. 48 (Bankr. N.D. Cal. 1993) (debtor's motion to avoid judgment lien was denied because the debtor did not direct the notice to an officer per Bankruptcy Rule 7004(b)(6)); In re Parrish, 171 B.R. 138 (Bankr. M.D. Fla. 1994) (creditor had a lien on debtor's tools, which lien continued to attach to the tools because the chapter 7 trustee never filed a motion to sell the tools free and clear of liens); In re

22

Cutaia, 206 B.R. 250 (Bankr. S.D. Fla. 1997) (sale of debtor's assets was subject to IRS's liens because chapter 7 trustee failed to comply with section 363(f) of the Bankruptcy Code); In re J.B. Winchells, Inc., 106 B.R. 384 (Bankr. E.D. Pa. 1989) (debtors' transfer of their liquor license was not free and clear of the IRS's perfected lien because the debtors did not comply with Bankruptcy Rule 6004(c)); Main v. Nat'l Union Fire Ins. Co. of Pittsburgh PA (In re Main), 157 B.R. 786 (Bankr. W.D. Pa. 1992) (debtors had knowledge of creditor's claim, which was a judgment lien against debtors, but debtors did not send notice of their bankruptcy petition to creditor, and creditor could not locate any such notice in creditor's files).

Unlike the cases mentioned above, Chemtura *did receive* actual and formal notice of the sale of the Debtors assets and, more importantly, Chemtura *does not have a lien or interest*, such as a tax or judgment lien, in the assets sold to ITG. See, e.g., Moody v. Bucknum (In re Bucknum), 951 F.2d 204, 206 (9th Cir. 1991) (where the Ninth Circuit did not disturb the bankruptcy court's factual finding that the creditors, who were judgment creditors, received proper notice of the final date on which the creditors may file a nondischargeability complaint against the debtor). Thus, Chemtura's argument that Bankruptcy Rule 6004(c) is applicable in these cases must fail. The Debtors provided notice to Chemtura consistent with the strictures of Bankruptcy Rule 2002(a)(2), and such notice was more than adequate and proper.

## B. Chemtura Received Due and Adequate Notice of the Sale of the Debtors' Assets to ITG.

### 1. Chemtura Cannot Deny That It Received The Sale Notice.

In reviewing the Bankruptcy Court's decision, this Court must review the Bankruptcy Court's findings of fact for clear error. U.S. and EEOC v. Knox-Schillinger (In re Trans World Airlines, Inc.), 322 F.3d 283, 287 (3d Cir. 2003). Here, the Bankruptcy Court

23

found that Chemtura did in fact receive due and proper notice of the sale of the Debtors' assets to ITG by virtue of Chemtura's receipt of the Sale Notice. More specifically, as demonstrated in the proceedings before the Bankruptcy Court, the Affidavit of Service creates the presumption that Chemtura received actual notice of the sale. Bankruptcy Rule 9006(e) provides that "notice by mail is complete on mailing." FED. R. BANKR. P. 9006. It is well established that mail, properly addressed, stamped and deposited into the mail is presumed to be received by the addressee. See In re Schicke, 290 B.R. 792, 801 n. 20 (B.A.P. 10th Cir. 2003); In re American Properties, Inc., 30 B.R. 247, 250 (Bankr. D. Kan. 1983).

Such a presumption can only be overcome if Chemtura produces clear and convincing evidence—a heightened legal standard—that the mailing was not in fact accomplished. See In re Grand Union Co., 204 B.R. 864 (Bankr. D. Del. 1997) (J. Walsh) (stating "it is a well established rule that the bar date notice is presumed to have been received by the creditor when, as here, the debtor offers proof that it was timely and properly mailed by the debtor . . . and the presumption is not rebutted by a mere denial of receipt by the creditor") (citations omitted); see also In re Cossio, 163 B.R. 150 (B.A.P. 9th Cir. 1994), aff'd, 56 F.3d 70 (9th Cir. 1995) (ruling that a mere statement that a summons and complaint were not received is insufficient to rebut proof that the documents were properly mailed and therefore served); In re Bucknum, 951 F.2d at 206-07 (agreeing with the bankruptcy appellate panel that a certificate of mailing creates a presumption of receipt of notice that the claimant failed to overcome); Osborn v. Ricketts (In re Ricketts), 80 B.R. 495, 498-99 (B.A.P. 9th Cir. 1987) (J. Jones, concurring) (stating that an allegation by the complaining creditor or its counsel that no notice was received, by itself, does not, absent evidence that all or a substantial number of other creditors failed to receive notice, overcome the presumption)

24

Moreover, an executed return of service is prima facie evidence of valid service which may be overcome only by strong and convincing evidence. In re Premium Sales Corp., 182 B.R. 349, 351 (Bankr. S.D. Fla. 1995); cf. In re Ted A. Petras Furs, Inc., 172 B.R. 170, 176 (Bankr. E.D.N.Y. 1994), appeal dismissed, 100 F.3d 943 (2d Cir. 1997) (stating that "[i]t has been found by the Second Circuit that when certified mail, return receipt requested, has been used to serve process, the signed receipt by the person being served provided virtually conclusive evidence that the notice was received . . . .")

Here, the Sale Notice was correctly addressed. The address used was the same address listed in Chemtura's business letterhead from which all pre-petition correspondence between the Debtors and Chemtura had been received. The proper mailing of the Sale Notice is evidenced by both the Affidavit of Service and the return receipt. Moreover, in addition to the signature acknowledging receipt by Chemtura, which provides conclusive evidence that, not only was the Sale Notice mailed, but that the Sale Notice was also actually received by Chemtura, *Chemtura's 30(b)(6) designee actually found the Sale Notice in Chemtura's files*. As stated above, the Sale Notice included, among other things, (a) reference to the sale procedures motion and the Bankruptcy Court's order approving same, (b) a sufficient description of the assets to be sold, (c) the manner in which copies of the asset purchase agreement could be obtained, (d) the date and time of the sale hearing, and (e) the deadline to object to the sale. Thus, Chemtura as a matter of law received actual, formal and proper notice of the sale and the sale hearing.

25

2.  **Chemtura's Failure To Pay Proper Attention To The Sale Notice On Account Of Chemtura's Flawed Internal Document Management Procedures Is Not The Fault Of Either The Debtors Or ITG.**

Chemtura goes to great lengths to explain that the Sale Notice wound up in a "dead" or "inactive" file. (Appellant's Br. 13-17.). The fact that the Sale Notice ended up in such a file is not the fault of either the Debtors or ITG. As explained above, the Debtors complied with the applicable Bankruptcy Rule by mailing the Sale Notice to Chemtura. Chemtura actually received the Sale Notice and the Sale Notice was indeed in Chemtura's possession. That Chemtura did nothing about the Sale Notice is Chemtura's own fault, and ITG as the buyer, which had no control over the noticing process, should not be punished for Chemtura's careless internal document management policy.

In addition, the Debtors undertook other reasonable measures designed to afford Chemtura and other parties-in-interest with notice of the sale. The Debtors filed the Sale Notice with the Bankruptcy Court on November 21, 2003, which notice was electronically mailed to all those parties-in-interest that filed notices of appearance in these Chapter 11 cases (something Chemtura failed to do), and served such notice via mail on the parties listed in the affidavit of service filed in connection therewith. In addition, the Debtors caused the *Notice of Sale and Auction Procedures* to be published in the national edition of *The New York Times* and *Women's Wear Daily* on November 18, 2003. (*ITG Ex. 6.*).

These actions, combined with the Sale Notice actually being delivered to and accepted by Chemtura, makes clear that Chemtura was reasonably—and actually—apprised of the pendency of the sale, the deadline to object to the sale and the date and time of the sale hearing. See, e.g., In re Grand Union, Co., 204 B.R. at 871 (stating that due process

26

considerations mandate that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (citation omitted).

Thus, the Debtors acted in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the orders of the Bankruptcy Court. Despite having received actual notice and publication notice of the sale (and thus actual notice of the bankruptcy proceedings as well), Chemtura appears to have sat on its rights and ignored the notices at its own peril. Chemtura, a sophisticated commercial entity, failed to file a notice of appearance, failed to file an objection to the sale and failed to appear at the sale hearing, but now wishes to have another bite at the apple because it seeks contribution from ITG to clean up the Chemtura Site, which property ITG never acquired, could not have acquired even if it wanted to, and never had anything to do with. As noted by one court:

> When the holder of a large, unsecured claim . . . receives any notice from the bankruptcy court that its debtor has initiated bankruptcy proceedings, it is under constructive or inquiry notice that its claim may be affected, and it ignores the proceedings to which the notice refers at its peril. "Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry may have led . . . . If [the creditor] had made any inquiry following receipt of the notice, it would have discovered that it needed to act to protect its interest.

Lawrence Tractor Co. v. Gregory (In re Gregory), 705 F.2d 1118, 1123 (9th Cir. 1983).

Because, as discussed above, Chemtura was given actual notice of the sale (and thereby actual notice of the bankruptcy proceedings), Chemtura was under a duty to promptly assert its rights. Instead, Chemtura institutionally chose to ignore the notice it received at its own

27

peril. ITG should not be held accountable for Chemtura's own actions and its neglect to pay proper attention to the Sale Notice that Chemtura received from the Debtors.

## CONCLUSION

For all the foregoing reasons, ITG respectfully requests this Honorable Court to uphold the ruling of the Bankruptcy Court that Chemtura (i) received due and adequate notice of the sale of substantially all of the Debtors' assets to ITG free and clear of all liens, claims and encumbrances, which includes Chemtura's successor environmental claims against ITG, pursuant to section 363 of the Bankruptcy Code; and (ii) is bound by the Sale Order entered by the Bankruptcy Court and is therefore barred from pursuing any claim, including any environmental contribution claim under any theory of successor liability or otherwise, against ITG.

Respectfully submitted,

Dated: December 15, 2005
New York, New York

**STROOCK & STROOCK & LAVAN LLP**
Lewis Kruger, Esq.
Christopher R. Donoho, Esq.
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

**DUANE MORRIS LLP**
Michael R. Lastowski, Esq. (DE I.D. 3892)
Christopher M. Winter, Esq. (DE I.D. 4163)
1100 North Market Street
Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

*Co-counsel for International Textile Group, Inc.*

28